CAREMARK, INC., Plaintiff,

v.

AFFILIATED COMPUTER SERVICES, INC., Defendant.

No. 99 C 1005.

United States District Court,
N.D. Illinois,
Eastern Division.

Aug. 10, 2000.

Howard M. Pearl, Thomas J. Wiegand, Winston & Strawn, Chicago, IL, for Caremark.

Edward C. Fitzpatrick, John R. Kloecker, Alegra Hyte, Lord, Bissell & Brooke, Chicago, IL, Charles W. Cunningham, Lewis T. LeClair, John Sabine DeGroote, McKool Smith, P.C., Dallas, TX, for ACS.

## MEMORANDUM OPINION

MORTON DENLOW, United States Magistrate Judge.

Plaintiff Caremark, Inc., through its former parent company, Baxter International, Inc. ("Caremark"), entered into a contract in 1992 with Affiliated Computer Services, Inc., ("ACS") in which ACS agreed to provide Caremark with data processing and related services. The agreement was amended in 1996. In April of 1999, Caremark brought a breach of contract action in federal court under diversity jurisdiction alleging breach of the amended contract. ACS filed a counterclaim. Caremark now brings a motion to compel production of documents consisting of letters, memos, notes and e-mails which ACS has refused to produce, asserting protection under the attorney-client privilege, the work product doctrine, or both. This Court conducted oral arguments on April 27, May 12 and June 13, 2000, at which time the Court ruled orally concerning the documents in dispute. A draft order was entered on June 22, 2000 which identifies the ruling on every document involved.

This opinion discusses the principles and reasoning the Court applied in its rulings. The opinion is confined to issues raised involving the work product doctrine.

## I. WORK PRODUCT DOCTRINE

The work product doctrine is a procedural matter in the federal courts, thus federal law controls in this diversity action. *In re Combustion, Inc.*, 161 F.R.D. 51, 52 (W.D.La. 1995); *Pete Rinaldi's Fast Foods Inc. v. Great Am. Ins. Co.*, 123 F.R.D. 198, 201 (M.D.N.C.1988). The work product doctrine, announced in *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), has been applied to protect otherwise discoverable documents and tangibles, including an attorney's thoughts and mental impressions, made in anticipation of litigation. The work product doctrine has been codified in Rule 26(b)(3) of the Federal Rules of Civil Procedure as follows:

> [A] party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of the materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

FED.R.CIV.P. 26(b)(3).

### A. Hickman v. Taylor

A review of *Hickman v. Taylor* assists in understanding the work product doctrine.

*Hickman* involved a Jones Act case brought by the administrator of the estate of a seaman who drowned while working on the "John M. Taylor" tugboat, which sank in the Delaware River. The tugboat's owners retained an attorney to represent them in the event of litigation. A public hearing concerning the accident took place at which the survivors testified. Shortly thereafter, the tugboat's lawyer obtained signed statements about the accident from the survivors. He also interviewed other witnesses and made memos of the interviews. After suit was filed, plaintiff sought copies of the signed statements and the memoranda of the witness interviews. The tugboat's lawyer refused to produce these documents and this issue was litigated up to the Supreme Court.

The Supreme Court unanimously held the documents need not be produced. The Court distinguished between disclosure of the facts learned from the statements, interviews and the documents in question. The facts must be disclosed in response to interrogatories or other proper discovery. "Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation. To that end, either party may compel the other to disgorge whatever facts he has in his possession." 329 U.S. at 507, 67 S.Ct. at 392.

Defendant's counsel was required to make full and honest answers to interrogatories as to the circumstances surrounding the fatal accident which "would necessarily have included all pertinent information gleaned by [counsel] through his interviews with the witnesses." *Id.,* 329 U.S. at 508, 67 S.Ct. at 392.

However, the Court did not require defense counsel to produce the written statements and mental impressions contained in his file absent a showing of necessity, undue prejudice, hardship or injustice. *Id.,* 329 U.S. at 509, 67 S.Ct. at 392. The Court emphasized the importance of permitting an attorney to work with a certain degree of privacy, free from unnecessary intrusion by opposing counsel. Counsel should be permitted to assemble information in the form of interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs and other tangible and intangible work product. "When Rule 26 and the other discovery rules were adopted, this Court and the members of the bar in general certainly did not believe or contemplate that all files and mental processes of lawyers were thereby opened to the free scrutiny of their adversaries." *Id.,* 329 U.S. at 514, 67 S.Ct. at 395. Plaintiff would not be unduly hindered in discovering the facts or anticipating his opponent's position because interrogatories and other discovery techniques were sufficient to reveal the facts. *Id.,* 329 U.S. at 513, 67 S.Ct. at 394.

## B. Other Supreme Count Decisions

The work product doctrine has been recognized as a qualified privilege, which is distinct from and broader than the attorney-client privilege. *U.S. v. Nobles,* 422 U.S. 225, 238, fn. 11, 95 S.Ct. 2160, 2170, 45 L.Ed.2d 141 (1975). In *Nobles,* the Court extended the work product doctrine to protect material prepared by investigators for the lawyer. *Id.,* 422 U.S. at 238, 95 S.Ct. at 2170.

Memoranda based on oral statements of witnesses are "the sort of material the draftsmen of the Rule 26 had in mind as deserving special attention." *Upjohn Company v. U.S.,* 449 U.S. 383, 400, 101 S.Ct. 677, 688, 66 L.Ed.2d 584 (1981). In *Upjohn,* the Court reaffirmed the strong public policy underlying the work product doctrine and emphasized that forcing an attorney to disclose notes and memos of witness oral statements is particularly disfavored because it tends to reveal the attorney's mental processes. *Id.,* 449 U.S. at 399, 101 S.Ct. at 687.

## C. Requirements of the Work Product Doctrine

In order to come within the qualified protection from discovery created by Rule 26(b)(3) a party claiming protection must satisfy three necessary elements. The material must be:

1. Documents and tangible things;

2. Prepared in anticipation of litigation or for trial; and

3. By or for a party or by or for a party's representative.

8 WRIGHT, MILLER & MARCUS, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2024 (1994).

■ To overcome the qualified protection, the party seeking discovery must make a showing of:

1. Substantial need for the materials, and
2. Inability to obtain the substantial equivalent of the information without undue hardship.

EDNA SELAN EPSTEIN, THE ATTORNEY-CLIENT PRIVILEGE AND THE WORK-PRODUCT DOCTRINE 293 (3rd ed.1997). Even upon such a showing, the lawyer's mental processes are required to be protected from disclosure.

There is an interplay between Rule 26(b)(3) and *Hickman v. Taylor*. Rule 26 applies only to tangibles and codifies that portion of the *Hickman* opinion that relates to documents. *Hickman v. Taylor* and other common law developments also govern intangibles, such as interviews. For example, *Hickman* addresses oral statements of a witness:

> Under ordinary conditions, forcing an attorney to repeat or write out all that witnesses have told him and to deliver the account to his adversary gives rise to grave dangers of inaccuracy and untrustworthiness. No legitimate purpose is served by such production. The practice forces the attorney to testify as to what he remembers or what he saw fit to write down regarding witness' remarks. Such testimony could not qualify as evidence; and to use it for impeachment or corroborative purposes would make the attorney much less an officer of the court and much more an ordinary witness. The standards of the profession would thereby suffer.

*Hickman*, 329 U.S. 495, 512–513, 67 S.Ct. 385, 394, 91 L.Ed. 451. However, opposing counsel may question a witness about what facts the witness discussed in the interview with the lawyer or investigator. *United States v. IBM*, 79 F.R.D. 378, 380 (S.D.N.Y. 1978).

**D. In Anticipation of Litigation or For Trial**

The threshold determination is whether the documents sought to be protected were prepared in anticipation of litigation or for trial. In *Upjohn Co. v. United States*, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981), the Supreme Court applied the work product doctrine even though no litigation against the company was threatened when the documents were prepared. As a general matter, "[p]rudent parties anticipate litigation, and begin preparation prior to the time suit is formally commenced. Thus the test should be whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *Binks Mfg. Co. v. National Presto Indus., Inc.*, 709 F.2d 1109, 1118–9 (7th Cir.1983) (citing 8 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2024); *Logan v. Commercial Union Insurance Co.*, 96 F.3d 971, 976 (7th Cir.1996). Therefore, "[t]he mere fact that litigation does eventually ensue does not, by itself, cloak materials prepared by an attorney with the protection of the work product privilege.... 'The work product rule does not come into play merely because there is a remote prospect of future litigation.'" *Binks* at 1118 (quoting *Diversified Indus., Inc. v. Meredith*, 572 F.2d 596, 604 (8th Cir.1977)).

■ Materials or investigative reports developed in the ordinary course of business do not rise to the status of work product. In order to qualify as work product, the material or report must come into existence because of the litigation or some articulable claim has arisen that is likely to lead to litigation. *Id.* at 1120. Essentially, documents that are created in the ordinary course of business or that would have been created irrespective of litigation are not under the protection of the work product doctrine. *U.S. v. Adlman*, 134 F.3d 1194, 1202 (2d Cir.1998). On the other hand, where a document is prepared because of the prospect of litigation, analyzing the likely outcome of that litigation, it does not lose protection merely because it is also created in order to assist with a business decision. *Id.*

**E. Internal Investigations**

■ Not all documents created or produced by a company can be categorized as

protected by work product simply because a company's internal investigation is co-existent with a present or anticipated lawsuit that is the same subject matter of the litigation. Not only must the "primary motivating purpose behind the creation of the document or investigative report ... be to aid in ... litigation," *Binks* at 1119, in order to be deemed protected, the document must also be of a legal nature and "primarily concerned with legal assistance; technical information is otherwise discoverable." *Loctite Corporation v. Fel–Pro, Inc.*, 667 F.2d 577, 582 (7th Cir.1981).

■ In addition, work product includes "[s]ubject matter that relates to the preparation, strategy, and appraisal of the strengths and weaknesses of the an action, or to the activities of the attorneys involved, rather than to the underlying evidence." *In re Air Crash Disaster at Sioux City, Iowa on July 19, 1989*, 133 F.R.D. 515, 519 (N.D.Ill.1990)(citing 4 MOORE'S FEDERAL PRACTICE, ¶ 26.64[1] at 26–349–350 (1989)). Thus,

> [i]f in connection with an accident or an event, a business entity in the ordinary course of business conducts an investigation for its own purposes, the resulting investigative report is produceable in civil pre-trial discovery.... [T]he distinction between whether defendant's 'in house' report was prepared in anticipation of litigation is an important one. The fact that a defendant anticipates the contingency of litigation resulting from an accident or event does not automatically qualify an 'in house' report as work product.... A more or less routine investigation of a possibly resistible claim is not sufficient to immunize an investigative report developed in the ordinary course of business.

*Binks* at 1119 (citations omitted).

The court in *Air Crash* was presented with similar issues to the instant case. In *Air Crash*, the airline company immediately implemented its own investigation of the airplane crash and the first lawsuit surrounding the incident was filed the next day. *See Air Crash*, 133 F.R.D. 515. The airline's purpose in the crash investigation was two-fold: one was to find the cause of the accident, improve aircraft products, protect future pilots and passengers, protect against adverse publicity, promote its own economic interests, and improve its prospects for future contracts with the manufacturer of the aircraft. *Id.* at 519–20. The other purpose was defense of the lawsuits filed. *Id.* at 519. Complicating matters, the airline assigned their attorneys overall responsibility for everything concerning the accident, so that nearly every communication regarding the investigation was sent through an attorney or sent with a copy to an attorney. *Id.* at 520.

Given the dual purposes of the investigation, the court considered whether all internal investigation and analysis following an event becomes work product once a lawsuit has been filed. *Id.* at 524. Using the test as set forth in *Loctite* and Professor Moore's definition, the court concluded that it did not, and ordered documents produced that would have been prepared in the same way even if no suit was ever filed or expected. *Id.* at 525.

**F. By or For a Party or By or For That Party's Representative**

Under Rule 26, as amended in 1970, materials prepared in anticipation of litigation by any representative of the client are protected, regardless of whether the representative is acting for the lawyer. Fed.R.Civ.P. 26(b)(3), Advisory Comm. Note, 48 F.R.D. 487, 502 (1970) ("Subdivision (b)(3) reflects the trend of the case by requiring a special showing, not merely as to materials prepared by an attorney, but also as to materials prepared in anticipation of litigation or preparation for trial by or for a party or any representative acting on his behalf.") Thus, whether a document is protected depends on the motivation behind its preparation, rather than on the person who prepares it.

■ Another issue in *Air Crash* was whether a written communication between company employees that has been sent through an attorney or sent with a copy to an attorney concerning some aspect of the investigation becomes work product because the ultimate findings will be conveyed to the attorneys who are in charge of the litigation.

*Id.* at 520. The *Air Crash* court noted that, if that were the case, then every document created would be protected by either the attorney-client privilege or the work product doctrine except for the publicly filed accident report. *Id.* The court declined to hold that the protection was that broad. Although the work product doctrine "clearly protects party, and not just attorney, preparation, the fact that a particular communication may not go to an attorney does not prevent its being work product." *Id.* at 520. However, "if an attorney is simply a 'mail drop' for the purposes of trying to create a screen against discovery, and the content of the document indicates it is neither work product nor a communication subject to the attorney client privilege, the fact that a document is sent through an attorney cannot prevent its having to be produced." *Id.* The court went on to order documents be produced between company employees that were routed through or copied to an attorney containing information and analysis on the crash investigation.

 In short, to be work product the document must come into existence because of the litigation, not in spite of it. If a document would have been created regardless of whether litigation was anticipated or not, it is not work product.

### F. Fact vs. Opinion Work Product

Federal Rule of Civil Procedure 26(b)(3) divides work product into two categories: 1) "opinion" work product, which reflects or reveals a lawyer's mental processes; and 2) "ordinary" or "fact" work product. Thus, courts have analyzed the work product doctrine in two contexts. Both are generally protected and can be discovered only in limited circumstances. *In re Grand Jury Proceedings*, 33 F.3d 342, 348 (4th Cir.1994). In either case, the burden rests on the party asserting the doctrine to establish the necessary elements. *Logan v. Commercial Union Insurance Co.*, 96 F.3d 971, 976 (7th Cir. 1996). In the fact work product context, the burden then shifts to the moving side to demonstrate a substantial need for the information, and that it would be exceedingly difficult to obtain the information any other

way. *Logan*, 96 F.3d at 976; *Vardon Golf Co. v. BBMG Golf Ltd.*, 156 F.R.D. 641, 646 (N.D.Ill.1994).

Opinion work product is even more scrupulously protected. *In re Grand Jury Proceedings*, 33 F.3d 342, 348 (4th Cir.1994). The Supreme Court has declined to rule whether this immunity is absolute, and, if not, the showing required to overcome a presumption of protection. *Upjohn Co. v. United States*, 449 U.S. 383, 401, 101 S.Ct. 677, 688, 66 L.Ed.2d 584 (1981). The Seventh Circuit also has not ruled directly on this issue. *Logan v. Commercial Union Insurance Co.*, 96 F.3d at 976, n. 4. However, in dicta, the court indicated that, under some circumstances, opinion work product may be discoverable. *Id.* While there exists a "heightened protection afforded an attorney's mental impressions and opinion," the Seventh Circuit came short of stating that the protection was absolute. *Id.* At least one district court has held that "mental impressions, conclusions, opinions, or legal theories" of an attorney are "absolutely privileged." *Vardon Golf*, 156 F.R.D. at 646. Suffice to say immunity from discovery for opinion work product is absolute or nearly absolute. *Bio–Rad Laboratories, Inc. v. Pharmacia, Inc.*, 130 F.R.D. 116, 121 (N.D.Cal.1990). In those circuits that do allow discovery for these type of documents, a "compelling showing" is required to produce the documents. *Id.*

Regarding the fact work product in this case, Plaintiff has not demonstrated a substantial need for the documents that Defendant asserts are protected by the work product doctrine, nor has Plaintiff demonstrated that it would suffer undue hardship in obtaining substantially the same information in some other way. Most of the factual information sought is being provided in answers to interrogatories or depositions. As to the attorney's mental impressions, conclusions, opinions, or legal theories, Plaintiff has not demonstrated a sufficient showing that would justify the production of these documents.

### II. APPLICATION OF WORK PRODUCT DOCTRINE TO ACS DOCUMENTS

Thus, the issue surrounding each document for which the doctrine is claimed is

whether Defendant can demonstrate that the documents were prepared because of possible litigation. More specifically, the questions presented in this case are as follows: Which documents between ACS employees, including those documents that were routed through or copied to an attorney, are documents that would have been prepared even if litigation was never filed or expected, and which are those prepared in anticipation of litigation? And at what stage of the renegotiation of the Caremark/ACS contract was there reasonable anticipation of litigation?

As to the first question, after hearing oral arguments on the issues of work product and attorney client privilege and reviewing each document, the Court applied the principles set forth above in an order dated June 22, 2000, incorporated into this opinion and made a part thereof.

 As to the second question, the Court finds that the first date that ACS could have reasonably anticipated litigation is December 4, 1998. On December 4, Duncan Rarity, ACS' Account Manager for the Caremark account, sent a memo requesting information to prepare for an upcoming meeting in which the prospect of litigation loomed, noting that ACS has entered into a "new phase" of their relationship with Caremark. (Bates No. ACS PRIV–002355). This memo is a clear indication that the events leading up to that day led to an anticipation by ACS of litigation.

Thereafter, the December 8, 1998 letter to John A. London, Vice President of ACS, from George H. Hepburn III, Vice President, Finance and Development of Caremark completes the shift from mere negotiations to contemplation of litigation. (Def.Ex. 1). In that letter, Caremark alleges "$7.0 million in over billings for contract year 1998." Caremark also informs ACS that they have "identified a number of contract non-compliance or billing irregularities, . . . a chronic pattern of over billings, documentation deficiencies and abuse of accounting principles" pertaining to ACS' billing practices. The letter then requested an immediate credit on the $7.0 million of identified over billings plus interest in the amount of 1.5% per month. Based upon the dollar amount of the claimed over bill-ings, the claimed over billings as a percentage of the total annual billings of $20 + million (approximately 30%), and the egregious nature of the accusation, it was reasonable for ACS to expect litigation to ensue upon receipt of the December 8, 1998 letter.

This was clearly the case, as evidenced by ACS's reaction. In response to this letter and the one dated November 30, 1998 from Richard Scardinia of Caremark to Thomas Solomon III, President Outsourcing Solutions at ACS, ACS drafted a letter dated December 9, 1998 to Caremark noting the "litigious tone" that Caremark had taken in its recent correspondence. (Bates No. ACS Priv–002346).

The Court finds unpersuasive ACS's claims that ACS anticipated litigation as early as November 30, 1998. ACS makes this assertion based on an August 6, 1998 letter received from MedPartners, Caremark's parent company after Baxter, (Bates No. ACS–006–000383 through 000387), a November 30, 1998 letter received from Caremark, (Def.Ex. 1), and the communications and activities that took place between the parties during that time. Although the August 6, 1998 letter to Jeffrey Rich, President of ACS from John Deane clearly reflects MedPartners' dissatisfaction with the Caremark/ACS relationship, it also reflects a willingness to work on the relationship and overcome any operational hurdles, even to the point of expanding the scope of the relationship to include other services. Mr. Deane writes that "MedPartners and Caremark find the proposals set forth in ACS' discussion paper woefully inadequate. We are extremely disappointed by them and with the Caremark–ACS relationship, although . . . we remain hopeful that the current agreement can be restructured and our relationship rebuilt. On the management and operational side, steps toward that end were initiated during the joint meetings of a couple of weeks ago, which I hear were very productive." MedPartners does not threaten litigation or even mention litigation, however, Deane does mention that although "Caremark is seriously considering the options available under the current contract (including electing cost plus pricing, exercising audit and inspection rights in a

vigorous effort to determine ACS' true and accurate costs, and seeking a reduction under the most favored customer provision), we remain interested in the kind of positive relationship our companies began to rebuild after we last re-negotiated the agreement." Deane then sets forth a number of points to address as the companies restructure the existing agreement and adds suggestions as to how to accomplish a mutually satisfactory relationship, even suggesting that Caremark/MedPartners "is willing to consider expanding the scope of the ACS relationship to include such areas as desktop support, telecommunications management and ... data center management for MedPartners as well as Caremark." The Court does not find that these communications are anything other than two parties to a contract attempting to work out a smooth, mutually satisfactory relationship pursuant to the terms of an existing agreement.

Similarly, the November 30, 1998 letter reflects no desire on Caremark's part to engage in litigation, nor is it reasonable that ACS could anticipate litigation from this letter. In addition, the Court observes that the letter was stamped "received" by ACS some time in December of 1998. Apparently finding negotiations unfruitful and oral requests for a cost plus pricing quote pursuant to the contract not being met to their satisfaction, Caremark sent a letter on November 30, 1998 requesting in writing a cost plus pricing quote from ACS. The body of the letter states:

> On September 11, 1998, I spoke to you about my desire to obtain a cost plus pricing quote before December 31, 1998 from ACS pursuant to Section 8.14 of our agreement. We discussed this request further at our quarterly meeting on October 15, 1998. To date, we have not received this quote nor any indication of when it will be available for our review.
>
> This letter is intended to document in writing our request for a cost plus pricing quote pursuant to Section 8.14 of the amended agreement.

(D.'s Resp. Ex. 1)

The Court also rejects Caremark's claims that the earliest date ACS could reasonably have anticipated litigation was January 14, 1999, the date Caremark's outside counsel sent a letter notifying ACS of a breach of the agreement. Based on the December 4, 1998 memo by Duncan Rarity, the Court finds that ACS reasonably anticipated litigation as of that date.

### III. CONCLUSION

For the foregoing reasons, **Caremark's motion to compel production of documents is granted in part and denied in part** as set forth in this Court's Order of June 22, 2000.