Connolly, Thomas E., J.
On March 14, 2006, Plaintiff, Patrick G. Cataldo, Jr. (“Cataldo”), was working as a power lineman for the Massachusetts Electric Company (“Mass Electric”) when an allegedly defective A.B. Chance potted porcelain cutout fell apart and dropped a 7,620-volt power line on him. Before the Court is Plaintiffs’ motion to compel defendants, National Grid USA and National Grid USA Service Company, Inc. (collectively, “National Grid”), together with National Grid’s wholly owned subsidiary, Mass Electric, to produce certain investigatory materials concerning the incident, including a report which National Grid stated it had prepared and was withholding under the attorney-client privilege and the work product doctrine. For the reasons discussed below, Plaintiffs’ motion is ALLOWED.
BACKGROUND
On August 1, 2003, National Grid issued a revision of its Incident Analysis Procedure. Pursuant to the Incident Analysis Procedure, every reported incident is investigated and analyzed, and an Incident Report form is completed. The Foreword to the Incident Analysis Procedure states: “National Grid USA employees believe that the only positive aspect arising from an incident is the knowledge gained which can be used to prevent similar incidents from occurring in the future. The basic principle of incident analysis is to analyze incidents with the purpose of gaining an understanding of the factors contributing to the events and learning from them. Improvement plans can then be put into place to prevent recurrence.” Section 1.0 states: “The purpose of this procedure is to ensure that injuries and serious incidents are analyzed thoroughly and promptly. To that end, the procedure requires the gathering of facts and the analysis of circumstances surrounding an incident so that... steps can be taken to avoid any recurrence. The procedure also ensures that information is published and distributed so that lessons learned can be utilized by others.” Attached to the Incident Analysis Procedure are four Appendices: (A) Incident Analysis Guideline Matrix; (B) Preliminary Incident Report Form; (C) Incident Analysis Report Form; and (D) Lessons Learned Report Form.
Incidents are categorized into four levels. For Levels 1 through 3, the Incident Analysis Procedure sets out specific guidelines including examples of the incidents which should be categorized in those levels, how the Investigative Analysis Team should be determined, what reports are required, and when those reports are due. For Level 4 incidents, however, no guidelines are set forth. Instead, the Incident Analysis Procedure indicates that the Legal Department will investigate all Level 4 incidents. For example, Section 6.7 states: “If the incident appears to be a Level 4, the Division Director consult [sic] with the Legal Department for final determination of the level. If the case is determined to be a Level 4 incident, it will not be included in this IA procedure, and the Legal Department will direct all investigatory activities” and Section 8.5 states: “All Level 4 incident analyses will be performed at the direction of the Company’s Legal Department.” See also Section 2.0 (indicating that the analysis of public incidents and incidents being investigated by OSHA may be conducted with the involvement of legal counsel “using a similar procedure” to the Incident Analysis Procedure). The Incident Analysis Guideline Matrix states that Level 4 incidents are “Public Incident[s] or OSHA Investigated Incidents].”[4]
After the incident, Scott J. Sciumeca (“Sciumeca”), Attorney for National Grid, was notified and he deter *494 mined that the incident should be categorized as a Level 4 incident. Sciumeca stated: “I determined that it was highly likely that litigation would result and that a detailed investigation into the circumstances surrounding this Incident was needed so that I might prepare for potential litigation and advise the National Grid companies of their legal rights and defenses.” Sciumeca set up an investigation team consisting of Joseph Cary, Michael Knott, and James Sullivan (“Sciumeca’s Team”). Sciumeca provided Sciumeca’s Team with specific questions and directed them to prepare a report answering the questions he posed. Sciumeca’s Team “undertook an investigation of this Incident, which included interviewing the crew members involved in the Incident . . . and gathering information in response to the specific questions [Sciumeca] posed. Upon completion of its investigation, the Team submitted its report and supporting documentation to [Sciumeca].” Sciumeca stated that the only other people besides himself and his Team who have seen the report and supporting documentation are National Grid’s outside counsel and other in-house counsel.
In addition to the investigation headed by Sciumeca, a “parallel investigation,” headed by James Sullivan, was undertaken for “the purpose of dispersing information and ‘lessons learned’ ” and was conducted pursuant to the Incident Analysis Procedure. The other team members were Michael Knott and Paul Brochu (“IATeam”). The completed Incident Analysis Report form was disclosed, but Sciumeca’s Team’s report has not been disclosed.
On November 19, 2007, this Court ordered Defendants to bring to Court all documents which they objected to producing for an evidentiary hearing. This Court then conducted an in camera review of the allegedly privileged materials. As far as the Court can determine, the Sciumeca’s Team’s report contains forty-nine exhibits and Defendants have produced all but two of those exhibits. These two exhibits are: (1) notes allegedly taken by Sciumeca’s Team during interviews with Thomas Coyle (“Coyle”), Richard Caproni, Jr. (“Caproni’j, and Mark Sullivan (“Sullivan”); and (2) diagrams of Pole 8246 before and after the incident. Therefore, the only documents which Plaintiffs seek to compel at this point are Sciumeca’s Team’s report, the interview notes, and the diagrams.
DISCUSSION
“[DJiscovery, by its nature, is quite broad.” Sullivan v. Chief Justice for Administration and Management of the Trial Court, 448 Mass. 15, 33 n.11 (2006), citing Mass.R.Civ.P. 26(b)(1) (“Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action”). Defendants have asserted that the documents requested are protected by both the attorney-client privilege and the work product doctrine. The Supreme Judicial Court has noted the differences between the attorney-client privilege and the work-product doctrine; specifically,
[t]he protection given both attorney-client communications and “work product” arise from a common assumption — that an attorney cannot provide full and adequate representation unless certain matters are kept beyond the knowledge of adversaries. The foci of the two doctrines are different, however. With the attorney-client privilege, the principal focus is on encouraging the client to communicate freely with the attorney; with work-product, it is on encouraging careful and thorough preparation by the attorney. As a result, there are differences in the scope of the protection. For example, the privilege extends only to client communications, while work product encompasses much that has its source outside client communications. At the same time, the privilege extends to client-attorney communications whenever any sort of legal services are being provided, but the work-product protection is limited to preparations for litigation.
Suffolk Construction Co. v. Division of Capital Asset Management, 449 Mass. 444, 455-56 (2007) (citation omitted). The burden, however, of proving that an attorney-client privilege or work product protection applies is with the party asserting it. In re Reorganization of Electric Mutual Liability Ins. Co., 425 Mass. 419, 421 (1997); City of Worcester v. HCA Management Co., 839 F.Sup. 86, 88 (D.Mass. 1993).
I. Attorney-client privilege
“[T]he attorney-client privilege shields from the view of third parties all confidential communications between a client and its attorney undertaken for the purpose of obtaining legal advice.” Suffolk Construction Co., 449 Mass. at 448 (citations omitted); see also Upjohn Co. v. United States, 449 U.S. 383, 390 (1981) (noting that the attorney-client privilege exists “to protect not only the giving of professional advice to those who can act on it, but also the giving of information to the lawyer to enable him to give sound and informed advice”). The essential elements are: (1) where legal advice of any kind is sought; (2) from a professional legal adviser in his capacity as such; (3) the communications relating to that purpose; (4) made in confidence; (5) by the client; (6) are at this instance permanently protected; (7) from disclosure by himself or by the legal adviser; (8) unless the protection can be waived. Admiral Insurance Co. v. U.S. District Court for the District of Arizona, 881 F.2d 1486, 1492 (9th Cir. 1989) (citation omitted). The attorney-client privilege applies to the communications of a corporation’s employees when those communications are within the employee’s corporate duties, were sought in order to provide legal advice, and were considered confidential when made and kept confidential by the corporation thereafter. Upjohn, 449 U.S. at 394-95.
To be privileged, National Grid must demonstrate that the communication would not have been made *495 but for the client’s need for legal advice or services. Leonen v. Johns-Manville, 135 F.R.D. 94, 99 (D.N.J. 1990) (citation omitted) (noting that this is necessary to prevent corporate attorneys from abusing the privilege by using it as a “shield to thwart discovery”).
II. Work product doctrine
The work product doctrine is designed to protect “written statements, private memoranda and personal recollections prepared or formed by an adverse party’s counsel in the course of his legal duties.” Hickman v. Taylor, 329 U.S. 495, 510 (1947); see Mass.R.Civ.P. 26(b)(3).[5] The work product doctrine also protects material prepared by agents for the lawyer. United States v. Nobles, 422 U.S. 225, 238-39 (1975). “The work-product rule is not a privilege but a qualified immunity protecting from discovery documents and tangible things prepared by a party or his representative in anticipation of litigation.” Admiral Insurance Co., 881 F.2d at 1494, citing Fed.R.Civ.P. 26(b)(3) (identical to Mass.R.Civ.P. 26(b)(3)).
“In order to place documents under the mantle of Rule 26(b) (3) for work product protection, a proponent must establish that the documents satisfy three criteria. The material must be: (1) documents or tangible things; (2) prepared in anticipation of litigation or for trial; and (3) by or for the party or the party’s representative.” Pete Rinaldi’s Fast Foods v. Great American, Inc., 123 F.R.D. 198, 201 (M.D.N.C. 1988) (citation omitted) (discussing federal rules of civil procedure). In determining whether a document was prepared in anticipation of litigation, courts ask “in light of the nature of the document and the factual situation in the particular case, the document can be fairly said to have been prepared or obtained because of the prospect of litigation." Id. (citation omitted); see also City of Worcester, 839 F.Sup. at 88 (“[T]he mere fact that [the defendant] was involved in an incident that would possibly subject it to litigation is not dis-positive of the determination of whether the memorandum was prepared in anticipation of litigation”); Caremark, Inc. v. Affiliated Computer Services, Inc., 195 F.R.D. 610, 614-15 (N.D.Ill. 2000) (citations and internal quotations omitted) (“Not all documents created or produced by a company can be categorized as protected by work product simply because a company’s internal investigation is co-existent with a present or anticipated lawsuit that is the same subject matter of the litigation”); In re Air Crash Disaster at Sioux City, Iowa on July 19, 1989, 133 F.R.D. 515, 520 (N.D.Ill. 1990) (citation omitted) (holding that whether a particular document is subject to the work product protection “depends on whether the subject matter of the document concerns preparation or strategy, or the appraisal of the strengths or weaknesses of [the company’s] case, or the activities of the attorneys in preparing their case, or is at least ‘primarily concerned with legal assistance,’ and not simply underlying evidence”). While the involvement of an attorney is highly relevant, it not necessarily controlling. Pete Rinaldi’s Fast Foods, 123 F.R.D. at 202 (citation omitted). For example, although a document may be sent to an attorney, if the role of counsel was “intended merely to immunize the documents from production” the privilege does not apply. In re Air Crash Disaster at Sioux City, Iowa on July 19, 1989, 133 F.R.D. at 519, 520 (citation omitted).
In addition, documents that are created in the ordinary course of business or that would have been created in “essentially similar form irrespective of the litigation” are not protected by the work product doctrine. U.S. v. Adlman, 134 F.3d 1194, 1202 (2d Cir. 1998); see also Janicker v. George Washington University, 94 F.R.D. 648, 650 (D.D.C. 1982) (internal citations omitted) (“The mere contingency that litigation may result is not determinative. If in connection with an accident or an event, a business entity in the ordinary course of business conducts an investigation for its own purposes, the resulting investigative report is produceable in civil pretrial discovery ... A more or less routine investigation of a possible resistible claim is not sufficient to immunize an investigative report developed in the ordinary course of business.”). To be protected, there must have been “an identifiable specific claim or impending litigation” when the materials were prepared. Leonen, 135 F.R.D. at 97 (citations omitted).
Some attorney work product is discoverable, however, upon a showing of need. Suffolk Construction Co., 449 Mass. at 457. “Although the rule affords special protections for work-product that reveals an attorney’s mental impressions and opinions, other work-product materials nonetheless may be ordered produced upon an adverse party’s demonstration of substantial need or inability to obtain the equivalent without undue hardship.” Admiral Insurance Co., 881 F.2d at 1494; see also Upjohn, 449 U.S. at 400.
After the incident, Sciumeca determined that the incident should be categorized as a Level 4 incident and set up an investigation team, consisting of Joseph Cary, Michael Knott, and James Sullivan, “to conduct a privileged and confidential investigation” under his direction and supervision. A “parallel” investigation by an IA Team was also conducted for “the purpose of dispersing information and ‘lessons learned,’ ” and was done pursuant to the Incident Analysis Procedure. Two out of the three members appointed to the IATeam, James Sullivan and Michael Knott, were also members of Sciumeca’s Team. In addition, James Sullivan was the “Team Leader” of the IA Team.
Sciumeca’s Team “undertook an investigation of this Incident, which included interviewing the crew members involved in the Incident . . . and gathering information in response to the specific questions [Sciumeca] posed.” Sciumeca provided Sciumeca’s Team with specific questions and directed them to prepare a report answering the questions he posed. *496 Pursuant to Section 5.3 of the Investigative Analysis Procedure, the IA Team was “responsible for conducting a diligent and impartial analysis of the incident.” The IA Team was required to perform the following tasks: (1) “Conduct interviews (comments from employees directly involved in the incident are very important and their input should be included in the IA Team’s findings)”; (2) “Perform site evaluations”; (3) “Request and coordinate technical and scientific assistance”; and (4) “Request, gather and review all pertinent data from internal and external sources."
National Grid has not provided any evidence indicating that the investigation done by Sciumeca’s Team was independent of the investigation done by the IA Team. In fact, there is evidence that the IA Team, not Sciumeca’s Team, conducted the interviews from which the interview notes attached to the Report as Exhibit 12 were produced. For example, Caproni, Coyle, and Sullivan all stated in their depositions that they met with Brochu, Sullivan, and Knott. None of these witnesses said that they ever met with Joseph Cary and there is no affidavit or deposition testimony from Joseph Cary indicating that he participated in any interviews. Further, in his deposition, Brochu stated that he, Knott, and Sullivan were present on March 22, 2006 for interviews with Caproni, Coyle, and Sullivan. On October 12, 2007, National Grid disclosed Brochu’s interview notes taken on March 22, 2006 for Caproni, Coyle, and Sullivan, which are contained in Exhibit 12, because Brochu was “part of the non-privileged investigation of this matter.”[6]
Upon completion of its investigation, Sciumeca’s Team submitted its report and supporting documentation to Sciumeca. Upon completion of its investigation, the IATeam prepared an Incident Analysis Report which was made public. Although Sciumeca’s Team’s report contains more detailed information than the Incident Analysis Report, the substance of the reports are the same: both contain the facts and analyze the causes of the incident.
Because of the overlap in team members, the similar responsibilities of the teams in conducting their respective investigations, the lack of evidence regarding the independence of the teams during their investigations and in the production of their reports, and the fact that the reports contain similar information, this Court finds that National Grid has failed to meet its burden of proving that the Report is protected by the work product doctrine or the attorney-client privilege. See Fisher v. United States, 425 U.S. 391, 402 (1976) (indicating that the attorney-client privilege “protects only those disclosures — necessary to obtain informed legal advice — which might not have been made absent the privilege”); Shotwell v. Winthrop Comm. Hospital, 26 Mass.App.Ct. 1014, 1016 (1988) (stating that when the work product is prepared in “the ordinary line of business and duty, looking to the gathering and beneficial use of information,” it does not enjoy protection under work product even if “such reports might ultimately be useful to one or another party in case of future litigation”).[7] Therefore, the Report and its exhibits are discoverable and National Grid must produce them.
As a final note, National Grid immediately categorized the incident and injuries as Level 4 in an attempt to utilize the attorney-client privilege and the work product doctrine as a shield to prohibit discovery of its investigation. National Grid has not seen fit to use this procedure for lesser injuries at Level 3 and below. This procedure appears to this Court to be an artificial scheme set up by National Grid to avoid giving meaningful discovery to severely injured claimants and hence to lessen its financial exposure on a potentially major injury. The report at issue is the only real comprehensive report made by National Grid.[8] National Grid has introduced an attorney into their nearly contemporaneous investigation for the sole reason of claiming the privilege and avoiding discovery. Such procedure constitutes a sham on the Court and the other parties in this case and will not be permitted.
ORDER
For the reasons discussed above, it is hereby ORDERED that the Plaintiffs’ Motion to Compel is ALLOWED. National Grid is required to produce the Report and all attached exhibits which have not previously been disclosed.

Sciumeca stated that in the course of a year, National . Grid undertakes approximately 1500 Level 1 through Level 3 incident analysis investigations. Further, only ten to twelve incidents per year are classified as Level 4 and Sciumeca is only involved in Level 4 incidents.

“[A] party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this Rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party’s representative (including his attorney, consultant, surety, indem-nitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.”

There are two other sets of notes in Exhibit 12 that have not been disclosed. Regardless of the admissibility of the Report, these interview notes should be disclosed. One set of notes has the date March 22, 2006 and specifically state: “IA Interviews.” These notes should be disclosed as they clearly are “part of the non-privileged investigation.” The other set of notes do not contain a legible date, but state that Jim Sullivan and Michael Knott were present. While the second set of notes *497 do not indicate that Brochu was present, this Court finds that National Grid has not met its burden of proving that the interview notes are subject to the attorney-client privilege because they have not proven that Jim Sullivan and Michael Knott were interviewing Caproni, Coyle, and Sullivan in their capacity as Sciumeca’s Team members instead of IA Team members. In addition, any IA Team investigation would necessarily be conducted in the ordinary course of business as there are 1500 incident analysis investigations a year; therefore, National Grid has not met its burden of proving that the interview notes are subject to the protection of the work product doctrine. See Shotwell, 26 Mass.App.Ct. at 1016 (indicating that when the work product is prepared in “the ordinary line of business and duty,” it is not protected by the work product doctrine); see also Adlman, 134 F.3d at 1202 (holding that documents that are created in the ordinary course of business or would have been created irrespective of litigation are not protected by the work product doctrine).

This case is similar to Soeder v. General Dynamics Corp., 90 F.R.D. 253 (D.Nev. 1980). In that case, after the crash of an F-lll, two separate reports were prepared by General Dynamics; one report was made public and the other, an “In-House Accident Report,” was not produced on the ground that it was protected by the work product doctrine. Id. at 254. The Plaintiff argued that the “In-House” report was prepared in the ordinary course of business and should be produced. Id. at 255. The Court agreed and stated:
it appears that the report was prepared shortly after the aircraft accident, and consists essentially of detailed, expert findings regarding the crash. Plaintiff claims, and Defendant concedes, that such reports are prepared routinely after every F-lll crash. Defendant claims such reports are prepared in anticipation of litigation, as well as because of a desire by Defendant to constantly improve its product, thereby saving lives and guarding against adverse publicity and the detrimental economic consequences which may flow from repeated crashes of their aircraft.
The fact that Defendant anticipated the contingency of litigation following a crash of one of its aircrafts does not automatically qualify'Defendant’s “in-house” report as work product. Certainly litigation is a contingency to be recognized by any aircraft accident. However, given the equally reasonable desire of Defendant to improve its aircraft products, to protect future pilots and passengers of its aircraft, to guard against adverse publicity in connection with such aircraft crashes, and to promote its own economic interests by improving its prospect for future contracts for the production of said aircrafts, it can hardly be said that Defendant’s “in-house” report is not prepared in the ordinary course of business.

Id.

Under the common law in Massachusetts, an employer has “the responsibility to provide a safe place to work as well as safe appliances, tools, and equipment for work. An employer was also required to give warnings of hidden dangers to employees and to promulgate and enforce rules for the conduct of its employees which would make the work place safe.” Longever v. Revere Copper & Brass, Inc., 381 Mass. 221, 223-24 (1980), citing W. Prosser, Torts §80 (4th ed. 1971). Implicit in the duly to provide a safe work place would be the duty to inspect and evaluate the work place, appliances, tools, and equipment for their safety, and, if needed, to make repairs and changes to the work place to make it reasonably safe for employees and other third parties.